13 CV 7634

# UNITED STATES DISTRICT COURT
## FOR THE SOUTHERN DISTRICT OF NEW YORK

| | |
|---|---|
| LOS ANGELES COUNTY EMPLOYEES RETIREMENT ASSOCIATION,<br><br>Individually and on Behalf of All Those Similarly Situated,<br><br>Plaintiff,<br><br>vs.<br><br>JP MORGAN CHASE & CO., CITIGROUP, INC., GOLDMAN SACHS GROUP, INC., HSBC HOLDINGS PLC, HSBC BANK USA, N.A., BANK OF AMERICA CORPORATION, BARCLAYS BANK PLC, CREDIT SUISSE GROUP AG, MORGAN STANLEY & CO. LLC, DEUTSCHE BANK AG, BNP PARIBAS, SOCIETE GENERALE S.A., THE ROYAL BANK OF SCOTLAND GROUP PLC, UBS AG and MARKIT GROUP, LTD.,<br><br>Defendants. | Civil Action No. _____<br><br>CLASS ACTION COMPLAINT FOR VIOLATION OF THE FEDERAL AND CALIFORNIA ANTITRUST LAWS<br><br><br>JURY TRIAL DEMANDED |



## TABLE OF CONTENTS

**Page**

I. INTRODUCTION ...................................................................................1

II. JURISDICTION AND VENUE.............................................................4

III. PARTIES ..............................................................................................5

IV. AGENTS AND CO-CONSPIRATORS ..............................................11

V. FACTUAL BACKGROUND ...............................................................12

    A.    Credit Default Swaps .............................................................12

    B.    The Lack of Market Transparency.........................................15

    C.    The CDS Market ....................................................................21

    D.    The Dealer Banks' Market Power Over The CDS Trading Market ..........22

VI. DEFENDANTS' WRONGFUL CONDUCT .......................................23

    A.    The Dealer Banks Conspired To Inflate CDS Transaction Costs .............23

        1.    Overview of Wrongdoing Alleged................................23

        2.    The Dealer Banks Control Trading And Information In the CDS Market ..................................................25

            a.    The Dealer Banks Control The Dissemination Of CDS Trading Information Through Defendant Markit.................................................................25

            b.    The Dealer Banks Control The Dissemination Of CDS Trading Data Through DTCC ...................................27

            c.    The Dealer Banks Dominate ICE CC, The Primary CDS Clearinghouse...........................................29

            d.    The Dealer Banks Control The Standardization Of CDS Contracts Through Their Domination Of The ISDA .................................................................32

    B.    Artificially Created Prices Would Not Have Existed In a Competitive Market .................................................33

**CLASS ACTION COMPLAINT FOR VIOLATION OF THE FEDERAL ANTITRUST LAWS**

C.    Government Investigations Into Anticompetitive Conduct By The
Dealer Banks ........................................................................................34

VII. CLASS ALLEGATIONS ........................................................................37

VIII. TRADE AND COMMERCE .....................................................................40

IX. FRAUDULENT CONCEALMENT ........................................................40

X.  COUNTS .................................................................................................41

XI. DEMAND FOR JURY TRIAL ................................................................45

**CLASS ACTION COMPLAINT FOR VIOLATION OF THE FEDERAL ANTITRUST LAWS**

Plaintiff Los Angeles County Employees Retirement Association ("Plaintiff" or "LACERA"), individually and on behalf of a Class of all those similarly situated, brings this action for damages and injunctive relief under the antitrust laws of the United States and California against JPMorgan Chase & Co., Citigroup, Inc., Goldman Sachs Group, Inc., HSBC Holdings plc, HSBC Bank USA, N.A., Bank of America Corporation, Barclays Bank Plc, Credit Suisse Group AG, Morgan Stanley & Co. LLC, Deutsche Bank AG, BNP Paribas S.A., Societe Generale S.A., The Royal Bank of Scotland Plc, and UBS AG (collectively "Dealer Bank Defendants"), and Markit Group Ltd. (along with the Dealer Bank Defendants, collectively "Defendants"), more fully identified below. Plaintiff's allegations are made on personal knowledge as to Plaintiff and its actions, and upon information and belief as to all other allegations.

## I. INTRODUCTION

1.      Plaintiff brings this antitrust class action on behalf of all persons and entities who purchased or sold credit default swaps ("CDS") directly from or to the Dealer Bank Defendants, as defined below, in the United States and its territories, or for delivery in the United States or its territories, from January 1, 2008 to the present (the "Class Period").

2.      The Dealer Bank Defendants named herein were the dominant dealers of CDS in the United States during the Class Period. Worldwide, the thirteen Defendant Dealer Banks control over 90% of all CDS trading. The Dealer Bank Defendants held and continue to hold monopoly power over the trading of CDS in the United States. Plaintiff alleges that the Dealer Bank Defendants conspired to restrain trade and preserve their collusive control over CDS trading in the United States for the purpose of

maintaining and receiving artificially inflated transaction costs for the purchase and sale of CDS and insuring their continued control over the U.S. CDS trading market.

3.     The Dealer Bank Defendants conspired to artificially inflate and maintain the transaction costs of participants in CDS trading by, among other things:  (a) establishing and controlling ICE Credit Clear LLC, the largest CDS-dedicated central clearinghouse that processes the vast majority of CDS trades; (b) obstructing the ability of sufficiently capitalized CDS dealer competitors from becoming members of that clearinghouse; and (c) limiting the availability of CDS trading data by excluding market participants, including investors and other actual or potential CDS dealers, from accessing CDS trading data.  The Dealer Bank Defendants' conspiracy to control CDS trading is and was effectuated in the rules, regulations and by-laws of various associations and corporations the they dominated and/or controlled, such as Defendant Markit Group, Ltd., the Depository Trust & Clearing Corporation ("DTCC"), the International Swaps and Derivatives Association ("ISDA") and CDS clearinghouse ICE Trust (now known as ICE Clear Credit).

4.     A CDS is a derivative financial instrument and is essentially a form of insurance against possible default of payment by the entity issuing an underlying financial obligation, typically a bond or loan (the reference entity). The person or entity seeking to guard against the default, the protection buyer, pays a regular fixed premium for the duration of the protection period usually five years, or until a default event occurs. Typically, the premium is a percentage of a CDS's notional amount (the total amount of the CDS) and is expressed in basis points (1/100[th] of a per cent).  The protection seller

receives the premium, and in exchange, agrees to promises to pay the protection buyer in the event of a predefined default event by the reference entity.

5.      CDS are sold over the counter ("OTC"), which means they are bilateral agreements between two counterparties. Because they are not traded on a central exchange, such as the New York Stock Exchange or NASDAQ, and the Dealer Banks control the entire market and pricing information, CDS investors must trade with the Dealer Banks. In addition, because they control the entities that collect valuable CDS transaction data, such as Markit and DTCC, they can and do keep that information from the investment community, publishing only aggregate trading information on a weekly basis. Thus, CDS investors are deprived of actual, real-time transaction data, and have to rely solely on aggregated and stale data published by Defendant Markit to try to determine accurate prices. The Dealer Banks are able to create and maintain a distorted market where CDS investors must rely entirely on Dealer Defendants to both effectuate the transactions, and accept the bids and offers for a particular CDS. As a result the Dealer Banks have been and are still able to maintain artificially inflated, non-competitive CDS transaction costs throughout the Class Period.

6.      As a result of the unlawful conduct by the Defendants and their co-conspirators, Plaintiff and other members of the Class paid more when they bought CDS protection and received less when they sold CDS protection than they otherwise would have in a competitive market. The Defendants' CDS-related conduct has been so egregious that it is currently under investigation by regulators in the United States and Europe.

**CLASS ACTION COMPLAINT FOR VIOLATION OF THE FEDERAL ANTITRUST LAWS**

7.     On July 1, 2013, the European Commission ("EC" or the "Commission," the European Union's antitrust regulator) reported that it "informed some of the world's largest investment banks of its preliminary conclusion that they infringed EU antitrust rules that prohibit anti-competitive agreements by colluding to prevent exchanges from entering the credit derivatives business between 2006 and 2009" and sent them a "Statement of Objections" for their collusive behavior in the European CDS trading market.  A Statement of Objections is a formal step in antitrust investigations by the Commission in which the Commission informs the parties concerned in writing of the objections raised against them.[1]

## II. JURISDICTION AND VENUE

8.     This action arises under Section 1 of the Sherman Act, 15 U.S.C. § 1, Sections 4 and 16 of the Clayton Act, 15 U.S.C. §§ 15 and 26 and California Business and Professions Code § 16720.

9.     This Court has jurisdiction under Sections 4 and 16 of the Clayton Act, 15 U.S.C. §§ 15(a) and 26, and 28 U.S.C. §§ 1331 and 1337.  This Court may exercise supplemental jurisdiction over Plaintiff's state law claim pursuant to 28 U.S.C. § 1367.

10.     Venue is proper in this District pursuant to 15 U.S.C. § 15(a) and 28 U.S.C. § 1391(b), (c) and (d), because one or more of the Defendants resided, transacted

---

[1] Historically, the Commission issues a Statement of Objections only when it believes it can make out its case and if necessary justify the imposition of a prohibition decision. The Statement of Objections is the product of considerable investigatory work.  In recent years, virtually every investigation of abuse of dominance where the EC has issued a Statement of Objections has resulted in significant alterations to the business practices of the dominant company. *See* Initiative for a Competitive Online Marketplace, Statements of Objection in Article 102 Investigations at 1.

**CLASS ACTION COMPLAINT FOR VIOLATION OF THE FEDERAL ANTITRUST LAWS**

business, were found, or had agents in this District and/or the claims arose at least in part in this District.

## III. PARTIES

### Plaintiff

11.     Plaintiff Los Angeles County Employees Retirement Association, one of the premier public pension funds in the country, administers and manages the retirement fund for Los Angeles County and outside Districts.  LACERA has provided retirement, disability, and death benefits to eligible County employees, retirees, and their beneficiaries since 1938.  As of June 30, 2012, LACERA's net assets held in trust for pension benefits totaled $38.3 billion.  Throughout the Class Period LACERA was a party (a protection buyer and/or a protection seller) to over $2.8 billion (notional value) in CDS transactions, purchasing or selling millions, and often hundreds of millions of notional value protection from each of the Dealer Bank Defendants.

### The Dealer Bank Defendants

12.     Defendant JPMorgan Chase & Co. ("JPMorgan Chase") is a Delaware corporation with its principal place of business in New York, New York.  During the Class Period, JPMorgan Chase was a dealer of CDS, buying CDS from members of the Class and selling CDS to members of the Class.  At all times during the class period JPMorgan Chase solicited orders from and executed CDS trades with class members within the United States.  Throughout the Class Period LACERA entered into over $147 million in CDS transactions with JPMorgan Chase and/or its subsidiaries and affiliates.

13.     Defendant Citigroup, Inc. ("Citi") is a Delaware corporation with its principal place of business in New York, New York. During the Class Period, Citi was a

dealer of CDS, buying CDS from members of the Class and selling CDS to members of the Class. At all times during the class period Citi solicited orders from and executed CDS trades with class members within the United States. Throughout the Class Period LACERA entered into over $82 million in CDS transactions with Citi and/or its subsidiaries and affiliates.

14. Defendant Goldman Sachs Group, Inc. ("Goldman Sachs") is a Delaware corporation with its principal place of business in New York, New York. During the Class Period, Goldman Sachs was a dealer of CDS, buying CDS from members of the Class and selling CDS to members of the Class. At all times during the class period Goldman Sachs solicited orders from and executed CDS trades with class members within the United States. Throughout the Class Period LACERA entered into over $203 million in CDS transactions with Goldman Sachs and/or its subsidiaries and affiliates.

15. Defendant HSBC Holdings PLC ("HSBC Holdings") is a bank holding, United Kingdom public limited company, organized under the laws of the United Kingdom, with its principal place of business in London, United Kingdom.

16. Defendant HSBC Bank USA, N.A. ("HSBC USA") is headquartered in McLean, Virginia with principal operations, including those responsible for trading in the U.S. CDS market, located in New York, New York. During the Class Period, HSBC USA was a dealer of CDS, buying CDS from members of the Class and selling CDS to members of the Class. Defendants HSBC Holdings and HSBC USA are referred to collectively here as "HSBC." At all times during the class period HSBC solicited orders from and executed CDS trades with class members within the United States. Throughout

the Class Period LACERA entered into over $14 million in CDS transactions with HSBC and/or its subsidiaries and affiliates.

17.    Defendant Bank of America Corporation ("BAC") is a Delaware corporation with its principal place of business in Charlotte, North Carolina.  During the Class Period, BAC was a dealer of CDS, buying CDS from members of the Class and selling CDS to members of the Class.  At all times during the class period BAC solicited orders from and executed CDS trades with class members within the United States. Throughout the Class Period LACERA entered into over $201 million in CDS transactions with BAC and/or its subsidiaries and affiliates.

18.    Defendant Barclays Bank Plc ("Barclays") is a United Kingdom corporation with its principal place of business in London, United Kingdom.  During the Class Period, Barclays was a dealer of CDS, buying CDS from members of the Class and selling CDS to members of the Class.  At all times during the class period Barclays solicited orders from and executed CDS trades with class members within the United States.  Throughout the Class Period LACERA entered into over $391 million in CDS transactions with Barclays and/or its subsidiaries and affiliates.

19.    Defendant Credit Suisse Group AG ("Credit Suisse") is holding company for a number of wholly owned subsidiaries with its principal place of business in Zurich, Switzerland.  During the Class Period, Credit Suisse was a dealer of CDS, buying CDS from members of the Class and selling CDS to members of the Class.  At all times during the class period Credit Suisse solicited orders from and executed CDS trades with class members within the United States.  Throughout the Class Period LACERA entered into

**CLASS ACTION COMPLAINT FOR VIOLATION OF THE FEDERAL ANTITRUST LAWS**

over $40 million in CDS transactions with Credit Suisse and/or its subsidiaries and affiliates.

20. Defendant Morgan Stanley & Co. LLC ("Morgan Stanley") is a Delaware limited liability corporation with its principal place of business in New York, New York. During the Class Period, Morgan Stanley was a dealer of CDS, buying CDS from members of the Class and selling CDS to members of the Class. At all times during the class period Morgan Stanley solicited orders from and executed CDS trades with class members within the United States. Throughout the Class Period LACERA entered into over $447 million in CDS transactions with Morgan Stanley and/or its subsidiaries and affiliates.

21. Defendant Deutsche Bank AG ("Deutsche Bank") is a German corporation with its principal place of business in Frankfurt, Germany. During the Class Period, Deutsche Bank was a dealer of CDS, buying CDS from members of the Class and selling CDS to members of the Class. At all times during the class period Deutsche Bank solicited orders from and executed CDS trades with class members within the United States. Throughout the Class Period LACERA entered into over $160 million in CDS transactions with Deutsche Bank and/or its subsidiaries and affiliates.

22. Defendant BNP Paribas S.A. ("BNP") is a French corporation with its principal place of business in Paris, France. During the Class Period, BNP was a dealer of CDS, buying CDS from members of the Class and selling CDS to members of the Class. At all times during the class period BNP solicited orders from and executed CDS trades with class members within the United States. Throughout the Class Period

LACERA entered into over $83 million in CDS transactions with BNP and/or its subsidiaries and affiliates.

23.     Defendant Societe Generale S.A. ("Societe Generale") is a French corporation with its principal place of business in Paris, France.  During the Class Period, Societe Generale was a dealer of CDS, buying CDS from members of the Class and selling CDS to members of the Class.  At all times during the class period Societe Generale solicited orders from and executed CDS trades with class members within the United States.  Throughout the Class Period LACERA entered into over $13 million in CDS transactions with Societe General and/or its subsidiaries and affiliates.

24.     Defendant The Royal Bank of Scotland PLC ("RBS") is a United Kingdom corporation with its principal place of business in Edinburgh, United Kingdom. During the Class Period, RBS was a dealer of CDS, buying CDS from members of the Class and selling CDS to members of the Class.  At all times during the class period RBS solicited orders from and executed CDS trades with class members within the United States.  Throughout the Class Period LACERA entered into over $21 million in CDS transactions with RBS and/or its subsidiaries and affiliates.

25.     Defendant UBS AG ("UBS") is a Swiss corporation with its principal place of business in Zurich, Switzerland.  During the Class Period, UBS was a dealer of CDS, buying CDS from members of the Class and selling CDS to members of the Class.  At all times during the class period UBS solicited orders from and executed CDS trades with class members within the United States.  Throughout the Class Period LACERA entered into over $58 million in CDS transactions with UBS and/or its subsidiaries and affiliates.

26.     Defendants named in paragraphs 12 through 25 are dealers of CDS in the United States.   The Defendants named in paragraphs 12 through 25 are collectively referred to herein as the "Dealer Banks" or the "Dealer Bank Defendants."

**Defendant Markit Group, Ltd.**

27.     Defendant Markit Group Ltd. ("Markit") is a privately-held company with its principal place of business in London, United Kingdom, with a number of offices in the United States including three offices within this District (two in New York, New York and a third in Rockland County, New York).   As alleged below, Markit is dominated by the Dealer Banks.   According to 2009 filings with regulators in the United Kingdom, Defendants BAC, Goldman Sachs, JPMorgan, and RBS, directly or through their subsidiaries, collectively owned 39% of Markit.   Markit was founded in 2001 to provide daily CDS pricing.   In 2002 the Dealer Banks and other banks agreed with each other and with Defendant Markit to take a majority share ownership of Markit.   Under this arrangement, the Dealer Banks agreed to supply Defendant Markit with exclusive information for their CDS trades, and Markit launched the world's first daily CDS end-of-day valuation service in 2003.   In September 2009, Markit and DTCC established a joint venture known as MarkitSERV LLC, a Delaware limited liability company that provides OTC derivative trade processing.   In April 2013, Markit bought all of DTCC's interest in MarkitSERV and Markit now owns 100% of MarkitSERV.   Markit and MarkitSERV collect and distribute trading information to the Dealer Banks from the sales of CDS on the OTC market.

## IV.  AGENTS AND CO-CONSPIRATORS

28.     The acts alleged against Defendants in this Complaint were authorized, ordered, or done by their officers, agents, employees, or representatives, while actively engaged in the management and operations of Defendants' businesses or affairs.

29.     Each Defendant acted as the principal, agent, or joint venturer of, or for, other Defendants with respect to the acts, violations, and common course of conduct alleged by Plaintiff.

30.     Various persons and/or firms not named as defendants in this Complaint participated as co-conspirators in the violations alleged herein and may have performed acts and made statements which aided and abetted and were in furtherance of the unlawful conduct alleged herein.  These co-conspirators include, but are not limited to, IntercontinentalExchange, Inc. a Delaware corporation with its principal place of business in Atlanta, Georgia; and ICE Trust U.S. LLC ("ICE Trust") a New York Trust Company with its principal place of business in New York, New York.  ICE Trust is owned by ICE US Holding Co., a Cayman Islands-based holding company established in 2008.  ICE US Holding Co. is owned by IntercontinentalExchange, Inc. and, among others, Defendants Citi, Goldman Sachs, JPMorgan Chase, and BAC.  ICE Trust operates a CDS central clearinghouse to which the Dealer Banks have directed much of their CDS trading since 2009.  On or about July 16, 2011, ICE Trust reorganized and became known as ICE Clear Credit LLC.  All further references in this Complaint use the term "ICE CC" to refer to either ICE Trust or ICE Clear Credit.  As further detailed below, the Dealer Banks Defendants' common ownership of Defendant Markit, coupled with their prominent role in setting the rules and regulations of the ICE CC clearinghouse, allowed

CLASS ACTION COMPLAINT FOR VIOLATION OF THE FEDERAL ANTITRUST LAWS

them to preclude competition in the CDS market by controlling the flow of information necessary for a free and competitive market.

## V. FACTUAL BACKGROUND

### A.  Credit Default Swaps

31.   A credit default swap is a contractual agreement that transfers the default or credit risk of one or more reference entities (described below) from one party to the other.  CDS were first developed in the 1990s by banks such as JPMorgan as a way for them to protect themselves against their exposure to large corporate loans they made to their clients.  Since then, CDS have been used to transfer default or credit risk associated with government bonds, mortgage-backed securities, corporate bonds and other forms of debt.

32.   The trading market for CDS has been largely unregulated since its inception.  On December 21, 2000, President Clinton signed into law the Commodity Futures Modernization Act of 2000 ("CFMA"), which exempted certain qualifying "swap agreements" from the Commodity Exchange Act and defined security-based swap agreements as not constituting "securities."   The CFMA thereby ensured that swap agreements, including CDS, were not subject to regulation by the Commodity Futures Trading Commission ("CFTC") or the Securities and Exchange Commission ("SEC").

33.   In 2010, Congress enacted the Dodd–Frank Wall Street Reform and Consumer Protection Act, which aimed to bring more competition by pushing CDS trading onto exchanges and swap execution facilities.  Following its enactment, the Dealer Bank Defendants sought to frustrate regulators' efforts to write tough rules and regulations for CDS trading.  Because such regulation threatened the Dealer Banks'

continued ability to fix prices and maintain their anticompetitive transaction costs, the

Dealer Banks conspired to prevent the entry of exchange trading for CDS.  As a result,

there has been no active and ongoing agency regulation of the conduct as alleged herein.

34.    A credit default swap is a type of derivative security – a financial

instrument whose characteristics and value depend upon the characteristics and values of

a "reference entity," another underlying financial instrument such as a commodity, bond,

stock or currency.

35.    Peter J. Wallison, the Arthur F. Burns Fellow in Financial Policy Studies

at the American Enterprise Institute for Public Policy Research, has diagramed and

explained how CDS operate:

FIGURE 1: HOW CREDIT DEFAULT SWAPS OPERATE



SOURCE: Peter J. Wallison.

Wallison, Peter J., "Everything You Wanted to Know about Credit Default Swaps – but

Were Never Told", *December 2008 Financial Services Outlook*, p.3 (American

Enterprise Institute for Public Policy Research).  He further explained:

> [….]  Bank B has bought a $10 million bond from company A, which in
> CDS parlance is known as "the reference entity."  B now has exposure to
> A.  If B does not want to keep this risk – perhaps it believes A's prospects
> are declining, or perhaps B wants to diversify its assets – it has two
> choices:  sell the bond or transfer the credit risk.  For a variety of tax and
> other reasons, B does not want to sell the bond, but it is able to eliminate
> most or all of the credit risk of A by entering a CDS.  A CDS is nothing
> more than a contract in which one party (the protection seller) agrees to
> reimburse another party (the protection buyer) against a default on a
> financial obligation by a third party (the reference entity).  In figure 1, the
> reference entity is A, the protection buyer is B and the protection seller is
> C.  Although figure 1 shows B purchasing protection against its entire loan
> to A, it is important to note that B also could have purchased protection
> for a portion of the principal amount of the $10 million bond.  The amount

**CLASS ACTION COMPLAINT FOR VIOLATION OF THE FEDERAL ANTITRUST LAWS**

of protection that B purchases is called the "notional amount."

*Id.*

36.    The CDS market is a dealer market – i.e., CDS transactions occur OTC

rather than on an exchange:

> The CDS market is a dealer market, so transactions take place through dealers, over the counter rather than on an exchange. Accordingly, in purchasing protection against A's default, B's swap is with C, a dealer – one of many, including the world's leading banks, that operate in this market. The structure of the CDS is simple. C agrees to pay $10 million (or whatever notional amount the parties negotiate) if A defaults, and B agrees to make an annual premium payment (usually paid quarterly) to C. The size of this payment or premium will reflect the risk that C believes it is assuming in protecting B against A's default. If A is a good credit, the premium will be small, and correspondingly the premium would be larger when the market perceives greater credit risk in A. Under the typical CDS contract, B is entitled to request collateral from C in order to assure C's performance. As a dealer, C generally aims to keep a matched book. For every risk it typically takes on, it typically acquires an offsetting hedge. So C enters a CDS with D, and D posts collateral. The transfer of B's risk to C and then to D (and occasionally from D to E and so on) is often described by many CDS critics as a "daisy chain" of obligations, but this description is misleading. Each transaction between counterparties in figure 1 is a separate transaction, so B can look only to C if A defaults, and C must look to D. B will not usually deal directly with E.

*Id.*

37.    Central clearing is the process of managing a transaction after buy and sell

orders have been submitted to – and matched by – dealers, but before the transaction

settles.   A central clearinghouse is responsible for clearing trades, collecting and

maintaining collateral from the participants, overseeing delivery and trade settlement, and

reporting transaction data.   A central clearinghouse manages the risk that could arise if

the purchaser of a CDS cannot make the required payment when it is due or the CDS

seller is unable to perform its contractual obligation following an event of default

(referred to as "counterparty risk").   Academic studies have found that "introducing a

CCP [central clearinghouse] for a particular set of derivatives reduces average

counterparty exposures if and only if the number of clearing participants is sufficiently large relative to the exposure on derivatives that continue to be bilaterally netted." Duffie, D. and Zhu, H., *Does a Central Clearing Counterparty Reduce Counterparty Risk?* pp. 2-3 (March 6, 2010).

**B.**     **The Lack of Market Transparency**

38.    From their inception, and through the present, CDS trades are almost exclusively conducted on the OTC market, rather than through a central exchange such as is done in the equities and corporate band markets. Investors seeking to buy or sell CDS cannot easily or efficiently do so directly between themselves but only through an intermediary, the CDS dealer. The Dealer Banks control the vast majority of CDS trades made in the United States OTC market. Regardless of whether a Class member is a buyer or seller of a CDS, virtually all CDS transactions in the United States are made through or by at least one of the Dealer Banks.

39.    During the relevant period, a relatively small number of dealers primarily consisting of the Dealer Banks dominated the dealer-to-dealer trades of CDS. The only practical way for a buyer or seller of a CDS to participate in that market was through one of the Dealer Banks.

40.    The CDS market, as designed and operated by the Dealer Banks, is "opaque," rather than "transparent." Transparent markets allow participants to obtain timely, accurate information indicating the price and size of prospective trading interest (pre-trade transparency) as well as the prices and volumes of completed transactions (post-trade transparency).

41.     Scholars have concluded that pretrade market transparency increases liquidity and narrows interdealer spreads.   By way of example only, Flood, *et al.*, summarized the results of their study, in part as follows:

> Pretrade transparency significantly reduces search costs, thus alleviating uncertainty and facilitating trade.  As a result, market liquidity, measured by spreads and volume is greater in the transparent market:  opening spreads are smaller and interdealer trading is much higher.

Flood, Mark D., *et al.*, "Quote Disclosure and Price Discovery in Multiple-Dealer Financial Markets" *The Review of Financial Studies* Spring 1999 Vol. 12, No. 1, pp 37-59 at 57.

42.     Even more specifically, examination of the private corporate bond, municipal bonds, NASDAQ equity markets, and regulatory efforts to increase the transparency of those markets, shows that increased price transparency and information results in lower transaction costs.

43.     For example, in the corporate bond market prior to 2002, quotations for the purchase of such bonds were available only to market professionals and prices at which bond transactions were completed were not publicly available information.  In July 2002, regulators of the United States corporate bond market introduced the Transaction Reporting and Compliance Engine ("TRACE") system which required corporate bond dealers to report all trades in publicly issued TRACE eligible securities making such information available to bond investors.  Several years after the introduction of the TRACE system, academic research found that "costs are lower for bonds with transparent trade prices and they drop when the TRACE system starts to publicly disseminate their prices.  The result suggests that public traders benefit significantly from price transparency."  Edwards, Harris & Piwowar, <u>Corporate Bond Market Transparency and</u>

CLASS ACTION COMPLAINT FOR VIOLATION OF THE FEDERAL ANTITRUST LAWS

Transaction Costs (March 2005).  See also Bessembinder, Maxwell & Venkataraman, Market Transparency, Liquidity Externalities, and Institutional Trading Costs in Corporate Bonds, Journal of Financial Economics 82 (2006) 251–288; Chester S. Spatt, Chief Economist and Director of the Office of Economic Analysis, SEC (2006) (citing Bessembinder and other academic studies that show that the initiation of public transaction reporting through the TRACE system found a 50% reduction in trade execution for bonds).

44.    As SEC Commissioner Annette L. Nazareth stated in a speech on February 7, 2006: "the widespread availability of timely price information, whether the security is equity or debt, promotes fair and efficient pricing.   Real-time price information aids investors and dealers in evaluating the current bid or ask for that security and furthers efficient price discovery."   Thus, the SEC along with academicians who have studied the implementation of the TRACE system concluded that increased transparency associated with TRACE transaction reporting is associated with a material decline in investors' trading costs.

45.    Similar studies of the municipal bond market and the introduction of greater transparency in that market in recent years conclude that greater price transparency in the municipal bond market results in lower transaction costs.  One such recent study found that the average trading costs in municipal bonds when they traded on an exchange were half of what they were in the OTC market, and attributed this differential to differences in market structure and greater price transparency.

46.    Studies of the NASDAQ equity trading market after market reforms were introduced in 1997 that increased reporting of bid-ask spreads also concluded that

CLASS ACTION COMPLAINT FOR VIOLATION OF THE FEDERAL ANTITRUST LAWS

increased transparency resulted in reduced spreads on NASDAQ trades.  The same result was observed as far back as 1973 in the equity option market.  In 1973, the Chicago Board Options Exchange ("CBOE") became the first organized and regulated market place for trading of standardized, listed options on equity securities.  What was found following the 1973 reforms was that moving such trading to an options exchange significantly enhanced the price transparency of options' trading resulting in not only greater liquidity for such options but also lower transaction costs for participants in those markets.

47.    Examples of transparent markets include the major exchanges for stock trading such as the NYSE or the NASDAQ.  Through the electronic reporting of trading volume and price during the trading hours on exchange listed stocks, market participants have almost instantaneous access to share price and volume traded.  The transparency of such markets also results in full disclosure of spreads for the buying and selling of stocks.  This results in narrower spreads between the "bid" and "ask" price on stocks compared to less transparent financial trading markets such as CDS.

48.    However, the CDS trading market is opaque.  In that market, there is no central exchange similar to the NYSE or the NASDAQ where the prices of CDS are listed and widely available to investors on both a pre-trade and post-trade basis.  Instead, when an end-user wants to buy a CDS, it must place an order with one of the Dealer Banks which then matches that order with someone selling the same type of CDS.  As a result of this opaque market, a Dealer Bank tells the buyer of a CDS only what that Dealer Bank will pay for the contract and tells the seller of the same contract only the amount it will receive.  The difference between the buy and sell price is commonly

CLASS ACTION COMPLAINT FOR VIOLATION OF THE FEDERAL ANTITRUST LAWS

referred to as the transaction cost, or spread.  The Dealer Bank profits from the spread between what it charged the buyer of a CDS and the amount the seller of that CDS received.

49.   The lack of transparency allows the Dealer Banks to keep CDS spreads artificially inflated, and enables the Dealer Banks to obtain monopoly profits on their CDS trades.  The derivatives-related revenues generated by Defendants are estimated to be in the range of $30 billion annually.  On information and belief, Plaintiff alleges that a significant portion of that amount is generated by the Dealer Banks CDS trading.  As a result, the Dealer Banks have every incentive to prevent the CDS market from becoming less opaque, as greater transparency would lead to greater competition, reduce spreads, and diminish the Dealer Banks' CDS trading profits.

50.   Unlike futures exchanges or the stock markets, which provide continuous information as to transaction prices and volumes, for CDS trading there is only one source of after-the-fact pricing information and even those data do not accurately reflect actual transactions.   The limited CDS price and volume data provided to market participants is published at the end of each trading day by Markit, a data collection and distribution service that is dominated by the Dealer Banks, as described below.  Although Markit collects and compiles the aggregate CDS transaction data that the Dealer Banks report to it at the end of each day, Markit does not report the actual trade data.  Instead, Markit reports the average price for these transactions.  Thus, neither Markit nor any other service provides actual transaction prices in CDS trading in real time as is true in the stock, options and futures markets.

51.     With no objective central price (like those provided by a stock exchange), the Dealer Banks' CDS trading desks are not required to mark their books to reflect actual transaction prices.  Instead, the Dealer Banks mark their books according to what they deem their positions to be worth.

52.     While in theory, end-users could shop around to several Dealer Banks, in practice and as a general rule the Dealer Banks will not provide a firm quote, but instead will just give an "indicative" or conditional price.  During the Class Period, the Dealer Banks were free to change the price of the transaction until the moment the trade was closed.

53.     End-users are dependent on their Dealer Banks as to the price they buy or sell a CDS.  Purchasers or sellers of CDS have no way of knowing whether the price is the best one, since there is no pre-trade transparency and limited post-trade transparency.  Purchasers and sellers have no way of knowing at what price counterparties are willing to buy or to sell, nor do they have comparable real-time price data against which to compare the price of their particular trade.  End-users do not know the equivalent of the bid and ask prices for the CDS they purchase but must rely instead on the price at which the Dealer Banks claim to be able to purchase or sell a particular CDS.

54.     Such an opaque market is an ideal one for the Dealer Banks.  The less the customer knows, the wider the spread the Dealer Banks can charge.  As a result, CDS trading has become one of the most lucrative and profitable lines of business for the Dealer Banks.  Based upon quarterly reports issued by the Office of the Controller of the Currency ("OCC"), the annual revenues generated by the OCC reporting Dealer Banks from CDS trading is at least $4.5 billion and likely much greater.  When added with

revenues generated from CDS trading by Defendant Dealer Banks that do not report CDS trading data to the OCC, Plaintiff is informed and believes that the Defendant Dealer Banks collectively generate over $10 billion in annual revenues from CDS trading.

55.     What investors did not know when they bought or sold CDS during the Class Period is that that market was rigged and manipulated by the Dealer Banks that dominate and control trading in CDS within the United States.

**C.     The CDS Market**

56.     The market which the Dealer Banks collusively controlled throughout the Class Period consists of CDS directly purchased from, or directly sold to, the Dealer Bank Defendants in the United States.  The Dealer Banks dominate and hold monopoly power over the CDS market.  Data from the OCC, the Bank for International Settlements and the Federal Reserve Bank of New York all confirm that the Dealer Banks control as much as 85 to 95% of CDS trading.  Moreover, as a report issued by the Federal Reserve Bank of New York in 2011 confirmed, four of the largest Dealer Banks control nearly 50% of all CDS trading.

57.     The OCC reports for CDS trading activity from 2008 through the first quarter of 2013 show the market power the Dealer Banks hold over CDS trading. Although its reports only cover banks that report and are regulated by the OCC, the market share of Defendants JPMorgan Chase, Citi, BAC, Goldman Sachs and HSBC USA steadily increased during the Class Period as reported to the OCC.  According to the March 31, 2009 quarterly OCC report, these five Dealer Bank Defendants controlled 97.51% of all OCC reported CDS trading.  Following the introduction of ICE CC central clearing in 2009, these five Dealer Bank Defendants increased their OCC reported market

**CLASS ACTION COMPLAINT FOR VIOLATION OF THE FEDERAL ANTITRUST LAWS**

share to 99.64% by March 31, 2013.  With the eight non-OCC reporting banks, the Defendant Dealer Banks collectively control nearly all CDS trades initiated in the United States.

58.     The end-users of CDS purchased or sold in the United States include insurance companies, pension funds, investment partnerships (commonly called "hedge funds"), bond and fixed income mutual funds and other financial and investment firms. Plaintiff alone purchased hundreds of CDS during the Class Period and estimates that it bought or sold CDS protection on billions of dollars in notional value.  As described below, the CDS market uses standardized contracts as promulgated by ISDA, as well as customized contracts.

59.     The Dealer Bank Defendants' monopoly power over CDS trading in the United States has existed since at least 2002.  By the acts and conduct alleged below, the Dealer Banks have conspired between themselves to insure their continued control over CDS trading in the United States including, among other things, excluding competitors from the CDS trading market through the establishment of ICE Trust in 2009.

**D.     The Dealer Banks' Market Power Over The CDS Trading Market**

60.     As alleged more fully below, the Dealer Banks exert control over trading in the CDS markets by, among other things, controlling the market infrastructure of CDS trading including the institutions that report trading data and those that clear and settle trades.  In particular, the establishment of ICE Trust (now known as ICE Clear Credit) and the Dealer Banks' domination of that institution have increased their ability to monopolize the CDS trading market.  Through such control the Dealer Banks are able to

**CLASS ACTION COMPLAINT FOR VIOLATION OF THE FEDERAL ANTITRUST LAWS**

set and maintain artificially inflated spreads as well as margin rates and leverage ratios for end-users of CDS.

## VI. DEFENDANTS' WRONGFUL CONDUCT

**A.     The Dealer Banks Conspired To Inflate CDS Transaction Costs**

     1.     Overview of Wrongdoing Alleged

     61.     Starting on or before January 1, 2008 and continuing through such time as the effects of Defendants' illegal conduct and conspiracy ceased, the exact dates being unknown to Plaintiff, Defendants and their co-conspirators engaged in a continuing agreement, contract, combination or conspiracy in restraint of trade for the purpose of artificially increasing and maintaining the spreads for CDS traded on the OTC market within the United States.

     62.     In participating in this illegal conspiracy, Defendants and their co-conspirators engaged in anticompetitive conduct, the purpose and effect of which was to artificially fix, raise, maintain or stabilize the spreads  for CDS traded in the United States.  Such activities included the following:

     a.     Defendants communicated among themselves concerning transaction costs, bid-ask spreads and otherwise shared information about the prices end-users of CDS paid or sold such contracts;

     b.     Defendants agreed through meetings and conversations among themselves to fix, raise, maintain or stabilize prices including the spreads for CDS;

     c.     Defendants, through their common ownership of Defendant Markit and other arrangements, effectively locked out other providers of information

CLASS ACTION COMPLAINT FOR VIOLATION OF THE FEDERAL ANTITRUST LAWS

about the market for and trading of CDS, reducing the transparency that otherwise would have allowed prices for CDS to be set on a competitive basis;

        d.      Defendants established in concert and used ICE CC to create membership rules and other practices that prevented other CDS dealers from transacting business on the largest CDS clearinghouse, thereby reducing competition in the CDS trading market; and

        e.      Defendants agreed and conspired to prevent other market participants such as CME from establishing CDS clearinghouses that could effectively compete with ICE CC.

63.    Evidence of Defendants' agreement and conspiracy to restrain competition in the CDS trading market is shown by by-laws and standards promulgated by ICE CC, DTCC and Defendant Markit.  As alleged more fully below, such by-laws and standards constitute an agreement within the meaning of § 1 of the Sherman Act.

64.    Defendants' anticompetitive conduct and restraint of trade resulted in severe adverse consequences for competition in the prices end-users bought or sold CDS. Plaintiff and the other Class members who purchased or sold CDS during the Class Period were deprived of a competitive trading market and were subject to artificially inflated spreads as a result of Defendants' illegal conduct.  As a direct result of such conduct, Plaintiff and the other Class members suffered financial losses and were injured in their business or property.

2.   The Dealer Banks Control Trading And Information In the
     CDS Market

    a.   **The Dealer Banks Control The Dissemination Of CDS
         Trading Information Through Defendant Markit**

65.    The Dealer Banks control the distribution of CDS price and trading

information through their domination and majority ownership of Defendant Markit, the

primary source of published CDS trading data.

66.    In 2001, Lance Uggla, a former credit trader for TD Securities, founded

Defendant Markit to provide reliable, independent valuation data for CDS.  Defendant

Markit's goal of independence was short-lived, however.

67.    In 2002, Markit agreed to sell a majority stake in the company to the

Dealer Banks.  On information and belief, Plaintiff alleges that Defendants JPMorgan

Chase, BAC, Deutsche Bank, Royal Bank of Scotland, Credit Suisse, Goldman Sachs,

Morgan Stanley and UBS currently own a majority interest in Markit.  Under the original

purchase agreement from 2002 the Dealer Banks agreed to supply Defendant Markit with

exclusive information on their CDS trades.  In 2002, when the Dealer Bank Defendants

banks agreed to take a majority ownership stake of Defendant Markit, Markit agreed to:

limit the dissemination of that CDS trading information; report only daily average (not

actual real time) prices for CDS transactions; and afford the Dealer Banks with unfair

access to Defendant Markit's pricing information.  The agreement enabled Defendant

Markit to become effectively the only source of published CDS trading data.  As a result

of this agreement, the Dealer Banks were able to control the dissemination of that data

including the critical information regarding the spreads on CDS trades.

68.    The Dealer Banks have dominated and controlled Defendant Markit

throughout the Class Period.  As Uggla explained to the *Financial Times*: "We conceded

majority [control] to the banks, but the banks are our best partners." Defendant Markit touts its own "privileged relationships with its shareholder banks," saying that they give the company "unparalleled access to a valuable dataset spanning credit, equities, and the broader OTC derivative universe."

69.     In November 2007, Defendant Markit acquired the owners of the CDX and iTraxx indices, giving Markit control of the major benchmark indices for the entire CDS market.  CDX, which covers North American referenced entities, and iTRAXX, which covers reference entities for other geographical areas particularly Europe, are defined baskets of reference entities upon which CDS contracts are written on the debt instruments of those entities issue.  Markit has also created a number of sub-indices such as CDX.NA. Investment Grade, CDX. NA. High Yield etc.  Defendant Markit's indices account for approximately half of all CDS trading globally.

70.     In 2009 when pressure built to move many CDS trades to clearinghouses, Defendant Markit only allowed companies seeking to establish CDS clearinghouses access to Markit's infrastructure if every CDS transaction that the clearinghouses guaranteed included one of Markit's bank partners.  By forcing the clearinghouses to clear only CDS transactions in which the Dealer Banks were participants, Defendant Markit stifled competition from other dealers that could have provided better prices and precluded end-users from buying and selling directly with each other without the Dealer Banks acting as an intermediary.  The conditions imposed by Defendant Markit delayed the creation of other CDS clearinghouses besides ICE CC, including CME Group, Inc. ("CME") and Eurex AG ("Eurex"), and continued to ensure the Dealer Banks' ability to artificially manipulate prices for end-users of CDS.  The Dealer Banks have been

successful in limiting the CDS transactions that have cleared through CME. As of February 2012, ICE Trust or its successor ICE CC had cleared $16.264 trillion of notional value of CDS, while CME had cleared only $189.5 million of notional value. As of February 24, 2012, ICE CC had $864 billion in open interest CDS contracts.

> **b.    The Dealer Banks Control The Dissemination Of CDS Trading Data Through DTCC**

71.    The Dealer Banks limit access to actual CDS trading data by their dominance of the entity that handles CDS trading settlements, DTCC.

72.    Once a Dealer Bank consummates a CDS trade, the terms, payments, and parties to that transaction must be formally processed and confirmed. These tasks are accomplished by DTCC which, through its subsidiaries, provides clearing, settlement and information services for equities, corporate and municipal bonds, government and mortgage-backed securities, money market instruments and OTC derivatives. DTCC handles all aspects of settling CDS trades for the Dealer Banks through its wholly owned subsidiaries the Warehouse Trust Company, LLC and DTCC Dirv/Serv, LLC.

73.    The Dealer Banks dominated DTCC and its subsidiaries. At present, nine members of DTCC's board of directors are affiliated with the Dealer Banks. DTCC's board of directors includes: Lori Hricik and Paul H. Compton of Defendant JPMorgan Chase, Suni Harford of Defendant Citi, Robin A. Vince of Defendant Goldman Sachs, Stephen Duffron of Defendant Morgan Stanley, Darryll Hendricks of Defendant UBS, Jonathon Hitchon of Defendant Deutsche Bank and Mark D. Linsz of Defendant BAC. In addition, Robert Druskin, Executive Chairman of DTCC's Board, was a top executive with Citi for sixteen years and one of the other DTCC directors is the Chairman of MarkitSERV LLC ("MarkitSERV"), a joint venture established in September 2009 by

DTCC and Defendant Markit which, as alleged above, the Dealer Banks dominate.  In April 2013, Markit bought out DTCC's interest in MarkitSERV and now owns 100%.  Thus, a substantial part of the DTCC board has a direct or indirect connection with the Dealer Banks.  The members of DTCC's board of directors met with each other on a regular basis throughout the Class Period, where they discussed and agreed to limit the dissemination of CDS trading data maintained by DTCC.

74.     MarkitSERV is the exclusive portal for the reporting of CDS OTC trading.  MarkitSERV provides trade confirmation, position reconciliation, and transaction processing for CDS trades worldwide.  MarkitSERV is governed by a Board of Directors, a substantial number of whom are representatives of the Dealer Banks.  Four additional directors, two from Defendant Markit and two from DTCC, constitute a board of eleven members.  With MarkitSERV, the Dealer Banks, through their influence over Defendant Markit, maintain control over CDS trade data.

75.     DTCC with its affiliates is the central repository for CDS settlement data.  Thus, DTCC is able to derive transaction prices from the data it has and receives.  DTCC could disseminate this information widely on a real-time basis to data vendors or other services providers, which would provide substantial post-trade transparency to the CDS market.  Pursuant to rules and regulations adopted by its board, DTCC has agreed not to disseminate real-time CDS trade data to market participants in order to preserve the Dealer Banks and Defendant Markit's control and domination of the CDS trading market.

76.     The timely widespread publication of actual CDS trading data by DTCC would undermine Defendant Markit's virtual monopoly on pricing information and provide the transparency that would result in reduced spreads, substantially reducing the

Dealer Banks' profits on these transactions.  Instead, DTCC publishes CDS post-trade pricing data on a weekly basis only.  This delayed publication serves to maintain opacity and artificially-inflated and/or maintained the spreads paid in CDS trading.

### c.   The Dealer Banks Dominate ICE CC, The Primary CDS Clearinghouse

77.     The Dealer Banks recognized that their dominance of CDS trading was threatened in late 2008 by rising calls from regulators and members of Congress for regulation of the CDS trading market.  In response, they attempted to blunt the impact of any reform by creating a central clearinghouse for CDS trades.  Central clearing is the process of managing a transaction after buy and sell orders have been submitted and matched, but before the transaction settles.  A central clearinghouse is responsible for clearing trades, collecting and maintaining collateral from the participants, overseeing delivery and trade settlement, and reporting transaction data.  A central clearinghouse manages the risk that could arise if the purchaser of a CDS cannot make the required payment when it is due or the CDS seller defaults on its obligation.   The central clearinghouse that the Dealer Banks created was ICE CC.

78.     ICE CC was formed on December 4, 2008 to serve as a central clearinghouse to clear North American CDS transactions.   Intercontinental Exchange, Inc. created ICE CC with a number of the Dealer Banks (including Citi, Goldman Sachs, JPMorgan Chase, Credit Suisse, Deutsche Bank, Morgan Stanley, UBS and BAC) by paying $39 million for Clearing Corp., a Chicago-based clearinghouse owned by Defendants Goldman Sachs, JPMorgan Chase, Citi, Credit Suisse, Deutsche Bank, Morgan Stanley, UBS and BAC.  Under the terms of the purchase agreement, the Dealer

Banks that co-own ICE CC evenly share in ICE CC's revenue with Intercontinental Exchange. On July 16, 2011, ICE Trust was reorganized and renamed ICE Clear Credit.

79.     The Dealer Banks are not merely co-owners of ICE CC, They also dominate the ICE CC Risk Committee ("Risk Committee"). Plaintiff is informed and believes that current members of the Risk Committee include Thomas J. Benison of Defendant JPMorgan Chase, Oliver Frankel of Defendant Goldman Sachs, Ali Balali of Defendant BAC and Biswarup Chatterjee of Defendant Citi. Plaintiff further alleges that executives from Defendants Barclays, Credit Suisse, Deutsche Bank, Morgan Stanley and UBS are also current members of the Risk Committee. The Risk Committee meets monthly in New York, New York where it sets the terms of CDS trading on ICE CC including which financial institutions may participate as dealers in ICE CC cleared trades. At the monthly meetings of the Risk Committee, the Dealer Banks' representatives make agreements and establish rules for participants in ICE CC for the express purpose of maintaining their monopoly power over the CDS trading market. Among other things, the Dealer Banks have agreed to establish unreasonably high net capital requirements upon any bank that wishes to participant in ICE CC.

80.     The Dealer Banks, using their control over ICE CC, in particular their control over the ICE CC Risk Committee, have conspired to exclude competition from other firms that seek to clear CDS trades through ICE CC, undermine competing clearinghouses that would allow clearing of end-user to end-user transactions, and keep the spreads paid by end-users artificially inflated.

81.     First, through their control over ICE CC, the Dealer Banks have established substantial barriers to entry by requiring any dealer that clears CDS trades

through ICE CC to have an enormous net worth. During virtually all of the Class Period, under rules set by the Risk Committee, a financial institution was not allowed to participate in ICE CC as a designated clearing member unless it had a net worth of at least $5 billion. This threshold has, for nearly the entire Class Period, effectively locked out competition from other end-users and other firms, such as Bank of New York Mellon and State Street Corporation from clearing trades on ICE CC. The ICE CC capital requirements are far greater than those for other clearinghouses.

82. Other rules and practices of ICE CC effectively lock out other competition. First, ICE CC does not permit real-time transactions by firms that are not designated clearing members. The lag time between when a CDS trade is submitted and when it is accepted for clearing increases the risk that the trade could be rejected. Because end-users could avoid this risk by conducting CDS trades through one of the Dealer Banks, this rule dissuades end-users from trading with smaller firms.

83. Second, ICE CC does not protect the anonymity of end-users that execute CDS trades through non-member firms. As end-users tend not to want their trading and hedging strategies exposed, this practice deters them from conducting CDS trades with smaller firms that cannot meet the ICE CC's designated clearing membership requirements.

84. Third, ICE CC imposes relatively high fees and allows low levels of leverage as compared to the prevailing terms in the bilateral market. Such fees and leverage caps do not deter the Dealer Banks from clearing trades on ICE CC, because they share in the revenue generated by ICE CC and are willing to accept each other's

credit.  Nonetheless, these terms discourage end-users and smaller dealers from clearing CDS trades through ICE CC.

85.     As a result of these exclusionary rules, nearly all of the CDS trades cleared through ICE CC are between the Dealers Banks, to the exclusion of any other potential market participants.  Although the Dealer Banks claim to compete in the CDS trading market against each other, the rules set by Dealer Banks acting through the ICE CC Risk Committee have limited and excluded competition in the CDS trading market.  Because any single Dealer Bank is unlikely to have sufficient inventory to meet all of its clients' demand for particular CDS products, the Dealer Banks trade with each other to satisfy their clients' needs, and clear those trades through ICE CC.  End-users of CDS, however, have limited ability to access ICE CC on their own and are primarily relegated to buying and selling with one of the Dealer Banks bilaterally in an opaque market.

86.     Thus, through ICE CC the Dealer Banks are able to limit the information available to investor and are able to maintain their overwhelming dominance in the markets enabling them to keep CDS pricing artificially high thereby inflating the spreads paid by end-users.

### d.     The Dealer Banks Control The Standardization Of CDS Contracts Through Their Domination Of The ISDA

87.     The financial and derivatives industry is served by several major service organizations that put on industry-wide meetings several times during each calendar year.  These meetings have facilitated collusion, and the service associations have themselves functioned as a means for Defendants to cooperate and discuss CDS prices and terms and conditions of CDS trading.

88.     ISDA is a key derivatives service association.  The Dealer Banks are all members of the ISDA.  The ISDA describes itself on its website as "represent[ing] participants in the privately negotiated derivatives industry, [and] is the largest global financial trade association."

89.     Throughout the Class Period, the Dealer Banks have dominated the ISDA. Presently, ISDA's officers include Diane Genova, a managing director of JPMorgan Chase.  Executives of Defendants Citi, Goldman Sachs, HSBC, Barclays, BNP, Credit Suisse, Deutsche Bank, RBS and BAC are members of ISDA's board of directors.  Eric Litvack, a high-level executive with Defendant Societe Generale, is currently the Vice Chairman and an officer of ISDA.

90.     One of the ISDA's critical functions is to define the terms of standardized derivative contracts.  Since the early 2000s and at all times during the Class Period, ISDA complied with the Dealer Banks' demands for particular terms and conditions in standardized CDS contracts.

**B.    Artificially Created Prices Would Not Have Existed In a Competitive Market**

91.     Numerous recent studies found that transaction costs in a financial trading market are dependent on that market's transparency.  Among other things, the availability of order flow information tends to reduce information asymmetry by equalizing information across market participants.  It has also been found that pre-trade price transparency in financial markets narrows spreads and thus transaction costs.  Economists and academics who have examined opaque markets such as the CDS market found that dealers in such oligopolistic markets can extract anti-competitive profits from market participants.

**CLASS ACTION COMPLAINT FOR VIOLATION OF THE FEDERAL ANTITRUST LAWS**

92.     In a nutshell, the CDS market during the Class Period is an opaque market dominated by a small number of liquidity suppliers behaving strategically to exploit market conditions and controlling trade information among themselves.  This has resulted in anti-competitive and artificially inflated spreads paid by the end-users, i.e., class members who were buyers and sellers of CDS.  Increased transparency has historically reduced spreads in trading markets.  For example, the introduction of the TRACE system in 2002 resulted in reduction of trading spreads of up to 50% in the bond trading market. The reduction in spreads following reforms being implemented in the NASDAQ equity markets further supports the conclusion that spreads in the CDS trading market were inflated by Defendants' anti-competitive conspiracy.

**C.     Government Investigations Into Anticompetitive Conduct By The Dealer Banks**

93.     Authorities in the United States and Europe are investigating anticompetitive practices with respect to CDS trading by the Dealer Banks.

94.     On July 15, 2009, U.S. Department of Justice ("DOJ") spokesperson Laura Sweeney confirmed that, "The Antitrust Division is investigating possible anti-competitive practices in the credit derivatives clearing, trading and information services industries."  On or about March 20, 2012, a DOJ spokeswoman confirmed that the DOJ's antitrust investigation of the CDS trading market was ongoing.  In August, 2013, Goldman Sachs and Morgan Stanley announced that they were cooperating in DOJ's antitrust investigation of the CDS trading market.

95.     On April 29, 2011, the European Commission announced that it had opened two antitrust investigations concerning the CDS market.  According to the EC's press release, "In the first case, the EC will examine whether 16 investment banks and

**CLASS ACTION COMPLAINT FOR VIOLATION OF THE FEDERAL ANTITRUST LAWS**

Markit, the leading provider of financial information in the CDS market, have colluded and/or may hold and abuse a dominant position in order to control the financial information on CDS." The EC stated that it "has indications that the 16 banks that act as dealers in the CDS market give most of the pricing, indices and other essential data only to Markit, the leading financial information company in the market concerned. This could be the consequence of collusion between them or an abuse of a possible collective dominance and may have the effect of foreclosing the access to the valuable raw data by other information providers."

96. The banks identified by the EC that are targets of the first investigation include all the Defendant Dealer Banks named herein. Defendant Markit was also implicated, with the EC further stating that: "The probe will also examine the behavior of Markit, a UK-based company created originally to enhance transparency in the CDS market. The EC is now concerned certain clauses in Markit's license and distribution agreements could be abusive and impede the development of competition in the market for the provision of CDS information."

97. The EC is also investigating whether certain banks received preferential treatment from CDS clearinghouse ICE CC that "have the effect of locking them in the ICE system to the detriment of competitors." The EC's press release stated that the investigation concerned a number of agreements between the CDS dealers at the time they formed ICE CC through the sale of Clearing Corp. to Intercontinental Exchange. The agreements "contain a number of clauses (preferential fees and profit sharing arrangements) which might create an incentive for the banks to use only ICE as a clearing house. The effect of these agreements could be that other clearing houses have

difficulties successfully entering the market and that other CDS players have no real choice where to clear their transactions."

98.     The EC identified banks that are targets of the second investigation as: BAC, Citi, Goldman Sachs, Barclays, UBS, RBS, Credit Suisse, HSBC, Morgan Stanley, Deutsche Bank, BNP and JPMorgan Chase, among others.  The EC further stated that it "will also investigate whether the fee structures used by ICE give an unfair advantage to the nine banks, by discriminating against other CDS dealers.  This could potentially constitute an abuse of a dominant position by ICE...."

99.     In a statement referring to the EC's investigations, European Union antitrust commissioner Joaquin Almunia said, "Lack of transparency in markets can lead to abusive behavior and facilitate violations of competition rules. ... I hope our investigation will contribute to better functioning of financial markets and, therefore, to more sustainable recovery."

100.     On March 26, 2013, the EC announced that it was likely to file an action against the largest banks, including Defendants named herein, for collusion in the European CDS trading market.  The EC also announced on that date that Defendant Markit and ICE Clear Europe (the European clearinghouse also owned by ICE Trust) were also part of the EC's investigation.  ISDA was also identified as a possible target of the probe into anti-competitive behavior in CDS trading.

101.     On July 1, 2013, after its investigation, the EC informed the Dealer Banks of its preliminary conclusion that "they infringed EU antitrust rules that prohibit anti-competitive agreements by colluding to prevent exchanges from entering the credit derivatives business between 2006 and 2009." Specifically, the EC stated that Deutsche

Börse and the Chicago Mercantile Exchange tried to enter the credit derivatives business by attempting to obtain the necessary licenses from ISDA and Markit. According to the preliminary findings of the Commission, the banks controlling these bodies instructed them not to grant licenses for exchange trading and thus prevented them from operating CDS exchanges. Additionally, the Commission noted that several of the Dealer Banks also used other tactics to shut out competition from exchanges, including coordinating their choices of preferred clearinghouses for CDS transactions. The Commission left no doubt that it believed that the Dealer Banks' action were taken to maintain their hold on the CDS market and their excessive profits from it: "The Commission takes the preliminary view that the banks acted collectively to shut out exchanges from the market because they feared that exchange trading would have reduced their revenues from acting as intermediaries in the OTC market." In the July 1, 2013 press release announcing the Statement of Objections, Joaquin Almunia, Commission Vice President in charge of competition policy, stated:

> It would be unacceptable if banks collectively blocked exchanges to protect their revenues from over-the-counter trading of credit derivatives. Over-the-counter trading is not only more expensive for investors than exchange trading, it is also prone to systemic risks.

## VII. CLASS ALLEGATIONS

102.    Plaintiff brings this action as a class action under Rules 23(a), 23(b)(2) and 23(b)(3) of the Federal Rules of Civil procedure, on behalf of itself and all others similarly situated. The proposed "Class" is initially defined as:

> All persons or entities who, between January 1, 2008 and the present ("Class Period"), purchased or sold CDS directly from or to the Dealer Bank Defendants, or their subsidiaries, agents and/or affiliates, in the United States and its territories, or for delivery in the United States or its

territories. Excluded from the Class are Defendants and their employees, affiliates, parents, subsidiaries and co-conspirators.

103. The Class is so numerous that joinder of all members is impracticable. While the exact number of the Class members is unknown to Plaintiff at this time and can only be discerned through discovery, Plaintiff is informed and believes that at least thousands of geographically dispersed Class members traded CDS during the Class Period.

104. Plaintiff's claims are typical of the claims of the other members of the Class. Plaintiff and other Class members sustained damages arising out of Defendants' common course of conduct in violation of law as complained herein. The injuries and damages of each member of the Class were directly caused by Defendants' wrongful conduct in violation of law as alleged herein.

105. Plaintiff will fairly and adequately protect the interests of the members of the Class and has retained counsel competent and experienced in class action litigation, including antitrust class action litigation.

106. Common questions of law and fact exist as to all members of the Class which predominate over any questions affecting solely individual members of the Class. Among the questions of law and fact common to the Class are:

a. Whether Defendants engaged in a contract, combination, and/or conspiracy to fix, raise, maintain, or stabilize prices of CDS including bid-ask spreads;

b. Whether Defendants' conduct caused the spreads in CDS to be greater than they otherwise would be in a competitive market;

      c.  The nature of and the period of time during which Defendants engaged in the antitrust conspiracy as alleged in this complaint;

      d.  Whether Plaintiff and the other members of the Class were injured by Defendants' conduct, and, if so, the appropriate class-wide measure of damages for Class members; and

      e.  Whether Plaintiff and the other members of the Class are entitled to, among other things, injunctive relief, and if so, the nature and extent of such injunctive relief.

107.    Defendants have acted on grounds generally applicable to the Class, thereby making final injunctive relief appropriate with respect to the Class as a whole.

108.    A class action is superior to other available methods for the fair and efficient adjudication of this controversy because joinder of all Class members is impracticable.  The prosecution of separate actions by individual members of the Class would impose heavy burdens upon the courts and Defendants, and would create a risk of inconsistent or varying adjudications of the questions of law and fact common to the Class.  A class action, on the other hand, would achieve substantial economies of time, effort and expense, and would assure uniformity of decision as to persons similarly situated without sacrificing procedural fairness or bringing about other undesirable results.

109.    The interest of members of the Class in individually controlling the prosecution of separate actions is theoretical rather than practical.  The Class has a high degree of cohesion, and prosecution of the action through representatives would be unobjectionable.  The amounts at stake for Class members, while substantial in the

aggregate, are not great enough individually to enable them to maintain separate suits against Defendants.  Plaintiff does not anticipate any difficulty in the management of this action as a class action.

## VIII.  TRADE AND COMMERCE

110.    During the Class Period, the Dealer Bank Defendants sold CDS on the OTC market in a continuous and uninterrupted flow of interstate commerce and foreign commerce, including though and into this judicial district.

111.    During the Class Period, Defendants collectively controlled the vast majority of the market for the trading of CDS in the United States.

112.    Defendants' business activities substantially affected interstate trade and commerce in the United States and caused antitrust injury in the United States.

## IX.  FRAUDULENT CONCEALMENT

113.    Defendants' unlawful conduct as alleged above was self-concealing. Defendants, along with other market participants, conspired and engaged in secret activities for the purpose of fixing, raising, maintaining, or stabilizing spreads for CDS. Defendants fraudulently concealed their participation in the conspiracy by, among other things, engaging in communications and periodic meetings with representatives of other Defendants in furtherance of the conspiracy.  Moreover, as detailed above, the nature of the CDS market is opaque and lacks the transparency that would have aided Plaintiff and other members of the Class in discovering the illegal conduct alleged herein.

## X.  COUNTS

### Count I for Violation of Section 1 of the Sherman Act
### (Against All Defendants)

114.    Plaintiff incorporates by reference and realleges the allegations set forth above as though fully set forth herein.

115.    During the Class Period, Defendants entered into and engaged in a contract, combination or conspiracy the purpose of which was to unreasonably restrain trade in violation of Section 1 of the Sherman Act and Section 4 of the Clayton Act.

116.    The conspiracy consisted of a continuing agreement, understanding or concerted action among Defendants and their co-conspirators in furtherance of which Defendants fixed, raised, maintained, or stabilized transaction costs for the purchase or sale of CDS, thereby creating anticompetitive effects.

117.    Defendants' acts in furtherance of their combination or conspiracy were authorized, ordered, or done by their officers, agents, employees, or representatives while actively engaged in the management of Defendants' affairs.

118.    Defendants' anticompetitive acts involved United States domestic commerce and had a direct, substantial, and foreseeable effect on interstate commerce by fixing, raising, maintaining or stabilizing the spreads of CDS throughout the United States.

119.    The conspiratorial acts and combinations have caused unreasonable restraints in the market for CDS.

120.    As a result of Defendants' unlawful conduct, Plaintiff and the members of the Class have been harmed by being forced to pay inflated, supracompetitive CDS spreads.

121.    In formulating and carry out the alleged agreement, understanding, and conspiracy, Defendants and their co-conspirators did those things that they combined and conspired to do, including but not limited to the acts, practices, and course of conduct set forth in this Complaint.

122.    Defendants' conspiracy had the following effects, among others:

    b.  Price competition in the CDS market has been restrained, suppressed, and/or eliminated in the United States;

    c.  Transaction costs for CDS purchased from or sold to Defendants have been fixed, raised, stabilized, and maintained at artificially high, non-competitive levels throughout the United States; and

    d.  Plaintiff and members of the Class who purchased CDS from or sold CDS to Defendants have been deprived of the benefits of free and open competition.

123.    As a direct and proximate result of Defendants' anticompetitive conduct, Plaintiff and the other Class members have suffered, and will continue to suffer, injury to their business or property, by paying more for CDS than they would have paid and will pay in the absence of the conspiracy.  These injuries are of the type that the antitrust laws were designed to prevent.

124.    Defendants' contract, combination, or conspiracy is *per se* a violation of the federal antitrust laws.

**Count II for Violation of the Cartwright Act,**
**Cal. Bus. & Prof. Code §§ 16720, *et seq.***
**<u>(Against All Defendants)</u>**

125.    Plaintiff incorporates by reference and realleges the allegations set forth

above as though fully set forth herein.

126.    By reason of the foregoing, Defendants have violated California Business and Professions Code, §§ 16700, *et seq.*

127.    During the Class Period, Defendants and their co-conspirators entered into and engaged in a continuing unlawful trust in restraint of the trade and commerce described above in violation of section 16720, California Business and Professions Code. Defendants, and each of them, have acted in violation of section 16720 to fix, raise, maintain, or stabilize transaction costs on CDS purchased or sold at supra-competitive levels, thereby creating anticompetitive effects.

128.    In particular, Defendants have combined and conspired to raise, fix, maintain or stabilize transaction costs on CDS purchased or sold in California and the United States.

129.    As a result of Defendants' unlawful conduct, transaction costs on CDS purchased or sold were raised, fixed, maintained, or stabilized in California and the United States.

130.    The contract, combination or conspiracy among Defendants consisted of a continuing agreement, understanding, and concerted action among Defendants and their co-conspirators.

131.    For purposes of formulating and effectuating their contract, combination, or conspiracy, Defendants and their co-conspirators did those things they contracted, combined, or conspired to do, including but not limited to the acts, practices, and course of conduct set forth in this Complaint.

132.   As a direct and proximate result of Defendants' unlawful conduct, Plaintiff has been injured in its business and property in that Plaintiff paid more for CDS than it otherwise would have paid in the absence of Defendants' unlawful conduct.  As a result of Defendants' violation of Section 16720 of the California Business and Professions Code, Plaintiff seeks treble damages and its cost of suit, including a reasonable attorney's fee, pursuant to section 16750(a) of the California Business and Professions Code.

## **PRAYER FOR RELIEF**

WHEREFORE, Plaintiff demands that judgment be rendered in favor of Plaintiff against Defendants as follows:

1.   Certifying this action as a class action pursuant to Rules 23(a), (b)(2) and (b)(3) of the Federal Rules of Civil Procedure, and designating Plaintiff as the representative of the Class and Plaintiff's counsel as counsel for the Class;

2.   Decreeing that Defendants engaged in a contract, combination and conspiracy in violation of Section 1 of the Sherman Act and California Business and Professions Code § 16720, and that Plaintiff and the other Class members were injured in their business and property as a result of Defendants' violations;

3.   Permanently enjoining Defendants, their subsidiaries, affiliates, successors, transferees, assignees and the respective officers, directors, partners, agents, and employees thereof, and all other persons acting or claiming to act on their behalf from continuing and maintaining the combination, conspiracy or agreement alleged herein, specifically including the promulgation and enforcement of the anticompetitive rules and regulations described above which have acted to foreclose competition the CDS market in the United States, including those rules and regulations that serve to: prevent

**CLASS ACTION COMPLAINT FOR VIOLATION OF THE FEDERAL ANTITRUST LAWS**

all qualified market participants from dealing in the CDS market; and foreclose new entrants in the exchange and electronic tracking of CDS.

4.       Awarding Plaintiff and the other Class members damages against Defendants for their violations of the federal and California State antitrust laws in an amount to be trebled in accordance with such laws;

5.       Finding Defendants jointly and severally liable for the damages incurred by Plaintiff and the other Class members;

6.       Awarding to Plaintiff and the other Class members pre-judgment and post-judgment interest at the highest legal rate from and after the date of service of the initial complaint in this action;

7.       Awarding to Plaintiff and the other Class members their costs of suit, including reasonable attorneys' fees and expert fees; and

8.       Granting such other and further relief as the Court deems just and proper.

## XI. **DEMAND FOR JURY TRIAL**

Plaintiff hereby demands a trial by jury in this action, pursuant to Rule 38(b) of the Federal Rules of Civil Procedure.

DATED: October 28, 2013            BRUCE L. SIMON
                                   GEORGE S. TREVOR
                                   AARON M SHEANIN
                                   THOMAS K. BOARDMAN

                                   THOMAS K BOARDMAN
                                   PEARSON, SIMON & WARSHAW, LLP
                                   44 Montgomery Street, Suite 2450
                                   San Francisco, CA 94104
                                   Telephone: (415) 433-9000
                                   Facsimile: (415) 433-9008

Jeffrey Lawrence
**The Lawrence Law Firm**
101 California Street, Suite 2710
San Francisco, CA 94104
Telephone: (415) 504-1601
Facsimile: (415) 504-1605

Wayne T. Lamprey
**Goodin, McBride, Squeri, Day &
Lamprey**
505 Sansome Street, Suite 900
San Francisco, CA 94111
Telephone: (415) 392-7900
Facsimile: (415) 398-4321

*Attorneys for Los Angeles County
Employees Retirement System Individually
and on Behalf of All Those Similarly
Situated*